[Cite as *Dennison Bridge, Inc. v. Resource Energy, L.L.C.*, 2015-Ohio-4736.]

STATE OF OHIO, HARRISON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| DENNISON BRIDGE, INC., | ) | CASE NO. 14 HA 21 |
| | ) | |
| PLAINTIFF- APPELLANT, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| RESOURCE ENERGY, LLC, ET AL., | ) | |
| | ) | |
| DEFENDANTS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from the Court of Common
                            Pleas of Harrison County, Ohio
                            Case No. CVH-2012-0024

JUDGMENT:                   Reversed and Remanded.

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: October 29, 2015

[Cite as *Dennison Bridge, Inc. v. Resource Energy, L.L.C.*, 2015-Ohio-4736.]
APPEARANCES:

For Plaintiff-Appellant:                                Atty. Steven J. Shrock
                                                       Critchfield, Critchfield
                                                       & Johnston, LTD.
                                                       138 East Jackson Street
                                                       Millersburg, Ohio 44654


For Defendants-Appellees:                               Atty. Gwenn S. Karr
                                                       Eckert Seamans Cherin &
                                                       Mellott, LLC
                                                       U.S. Steel Tower
                                                       600 Grant Street, 44th Floor
                                                       Pittsburgh, Pennsylvania 15219

                                                       Atty. Christopher B. Wick
                                                       Hahn Loeser & Parks, LLP
                                                       200 Public Square, Ste. 2800
                                                       Cleveland, Ohio 44114

[Cite as *Dennison Bridge, Inc. v. Resource Energy, L.L.C.*, 2015-Ohio-4736.]

ROBB, J.

**{¶1}** Plaintiff-Appellant Dennison Bridge, Inc. filed an action in the Harrison County Common Pleas Court to have an oil and gas lease terminated. The trial court granted summary judgment in favor of Defendants-Appellees Resource Energy, L.L.C. ("Resource") and CNX Gas Company L.L.C. ("CNX") (collectively "Appellees"). The court found as a matter of law that Resource was reasonably diligent in resuming production after experiencing a mechanical issue with the well. We agree with Appellant's first argument that there remain genuine issues of material fact as to whether Resource was reasonably diligent in resuming production.

**{¶2}** Appellant's second argument claims the lease is void ab initio as a "no term" perpetual lease. Appellant acknowledges that recent cases out of this court have disposed of this issue. Appellant explains that the issue is raised to preserve it for further review. We maintain our holding in *Hupp v. Beck Energy Corp.* and the cases derived therefrom, and we conclude that the lease is not void.

**{¶3}** For the following reasons, the entry of summary judgment is reversed, and the case is remanded for further proceedings.

<u>STATEMENT OF THE CASE</u>

**{¶4}** In 1972, an oil and gas lease was executed for land in Harrison County now owned by Appellant. The habendum clause of the lease provides in pertinent part that the lease shall continue for ten years "and so much longer thereafter * * * as oil and gas or their constituents shall be found on the premises in paying quantities in the judgment of the Lessee * * *." A well was drilled the same year the lease was executed, and the production of oil commenced.

**{¶5}** On March 19, 2012, Appellant filed a complaint (amended on June 13, 2012) against Appellees, who are the current lessees under the lease. Resource owns the shallow rights and operates the current well. CNX owns the deep rights. Appellant sought: a declaratory judgment that the lease terminated due to cessation of production in paying quantities in 2010 and that the lease was not a valid and legally binding lease; quiet title; specific performance to compel the removal of the wellhead equipment and the plugging of the well; and damages for conversion.

**{¶6}** Appellees filed motions for summary judgment. They urged in pertinent part that the cessation of production in paying quantities was temporary and they used reasonable diligence to resume production. Appellant responded and filed a partial motion for summary judgment on all claims except damages for conversion. Appellant argued that the length of time to resume production was unreasonable. Appellant alternatively claimed that the lease was contrary to public policy and void ab initio as a "no term" perpetual lease.

**{¶7}** All parties utilized the affidavit and deposition of Bobby Cayton, the Regional Operations Manager for Resource's parent company. Exhibits were incorporated into the affidavit. Cayton explained the efforts to repair the well and opined that in his experience in the industry, "given the circumstances, the time for repair was completely reasonable." The following facts are derived from Cayton's statements.

**{¶8}** In February 2010, the well showed signs of a problem. On February 19, 2010, Resource hired a subcontractor to plow the snow from the area. (Aff. at ¶ 10; Exhibit C; Depo. at 28). It was ascertained that the issue did not lie on the surface and could not be fixed by the production foreman.[1] A subcontractor performed diagnostic and remedial procedures on April 7, 2010, after winter was over. (Aff. at ¶ 13-15; Exhibit D; Depo. at 35, 37).

**{¶9}** First, the structural integrity of the well was tested with a water injection. (Aff. at ¶ 14). When no leaks manifested, a solvent was injected into the well to dissolve paraffin build up which can cause a "down hole" well pump to seize up. (Aff. at ¶ 15; Depo. at 35, 44). It takes "a few weeks to a few months" to ascertain whether the solvent worked, depending on the hardness of the paraffin. (Aff. at ¶ 16; Depo at 44-45). Cayton assumed the production foreman went to the well periodically to check whether the solvent worked after the April 7, 2010 injection, as that is the typical procedure. (Depo. at 45-47).

**{¶10}** When the injection did not solve the problem, the next step was to order a service rig from a third-party to pull the well equipment and to replace the down

---

[1] Resources sold the oil left in the tank on March 18, 2010, and a royalty was paid soon thereafter. (Depo. at 80-81).

hole pump. However, an Authorization for Capital Expenditure ("AFE") had to be approved before a rig could be scheduled. (Depo. at 49, 61-62). Estimates from third-party contractors (who have Master Services Agreements on file) must be obtained in order for the foreman to prepare the AFE. (Depo. at 51).

**{¶11}** Cayton stated that by the time it was ascertained the solvent did not work, Resource could not schedule a service rig for the 2010 season because the subcontractor books the jobs at the beginning of the year. (Aff. at ¶ 19-20; Depo. at 57, 69-70). Cayton explained that rig repair work generally does not take place in the winter due to safety issues (and laws with weight limits on some winter roads). (Depo. at 58-59, 62; Aff. at ¶ 21). Only high priority projects, such as those that impact the environment or threaten public safety, are undertaken in the winter. (Depo. at 62-63, 85; Aff. at ¶ 20). Cayton noted that the high priority examples he provided usually did not require a service rig. (Depo. at 63).

**{¶12}** In February 2011, the parent company of Resource was sold to Chevron, who required new Master Services Agreements with all subcontractors. (Depo. at 54-55, 87-88). New agreements with the three subcontractors eventually used to repair the well were entered into on: April 8, 2011 (the subcontractor who supplied the rig); June 21, 2011 (the subcontractor who performed access road work); and June 23, 2011 (the subcontractor who supplied the pump). (Aff. at ¶ 24-26; Exhibits E, F, G).

**{¶13}** On July 5, 2011, the subcontractor to supply the pump provided a work order. On July 22, 2011, the AFE was prepared by Resource and sent to the parent company for approval. The AFE was approved on August 2, 2011. The estimated cost was approximately $7,000, which was expected to be recouped within five months of fixing the well. (Depo. at 73). The repair project began on August 19, 2011 and was completed on August 25, 2011, on which date production resumed. (Depo. at 78).[2]

**{¶14}** On November 19, 2014, the trial court granted summary judgment in favor of Appellees. The trial court recited various facts and concluded that production

---

[2] The actual cost was closer to $11,000. (Exhibits J-N). The oil produced was sold in October 2011. The resulting royalty checks were tendered in January 2012 and rejected by Appellant.

did not cease for an unreasonable amount of time. The court found that much of the delay was caused by scheduling conflicts not under the control of Resource. The court held that Resource engaged in reasonable efforts to repair the well and to place it back into production. The trial court overruled Appellant's perpetual lease argument by citing the decision in *Hupp*, which this court released on September 26, 2014. *See Hupp v. Beck Energy Corp.*, 7th Dist. Nos. 12MO6, 13MO2, 13MO3, 13MO11, 2014-Ohio-4255, 20 N.E.3d 732.

**{¶15}** Appellant filed a timely appeal to this court. Appellant lists one general assignment of error: "The trial court erred by granting Defendants-Appellees summary judgment." Appellant specifies two issues: whether Resource acted with reasonable diligence as a matter of law and whether the lease violates public policy as a perpetual lease.

<u>SUMMARY JUDGMENT</u>

**{¶16}** Summary judgment can be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). The movant has the initial burden to show that no genuine issue of material fact exists. *Byrd v. Smith*, 110 Ohio St.3d 24, 26-27, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, citing *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996).

**{¶17}** The non-moving party then has a reciprocal burden. *Id.* The non-movant's response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing that there is a genuine issue for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E). In doing so, the non-movant can rely on the evidentiary material submitted by the movant rather than submitting independent evidentiary material. *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990) (city's physical condition survey, which city council expressly relied upon, would allow a reasonable mind to find the majority of structures were not in poor condition when that survey is viewed in the light most favorable to the non-movant).

**{¶18}** Civ.R. 56 must be construed in a manner that balances the right of the non-movant to have a jury try claims and defenses that are adequately based in fact with the right of the movant to demonstrate, prior to trial, that the claims and defenses have no factual basis. *Byrd*, 110 Ohio St.3d 24 at ¶ 11, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Doubts are to be resolved in favor of the non-movant. *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993). In determining whether there exists a genuine issue of material fact to be resolved, the court is to consider the evidence and all reasonable inferences to be drawn from that evidence in the light most favorable to the non-movant. *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 11. A court "may not weigh the proof or choose among reasonable inferences." *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121, 18 O.O.3d 354, 413 N.E.2d 1187 (1980).

**{¶19}** "The material issues of each case are identified by substantive law." *Byrd*, 110 Ohio St.3d 24 at ¶ 12. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We consider the propriety of granting summary judgment under a de novo standard of review. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8.

<u>REASONABLE DILIGENCE</u>

**{¶20}** Appellant's first issue presented asks:

"Whether genuine issues of material fact precluded the trial court from finding, as a matter of law, that Defendant Resource Energy, LLC, acted with 'reasonable diligence.' ""

**{¶21}** After the primary term of a lease expires, it is common for the secondary term to be conditioned upon oil or gas being found in paying quantities. *See, e.g., Brown v. Fowler*, 65 Ohio St. 507, 63 N.E. 76 (1902), syllabus at ¶ 2. *See also Hanna v. Shorts*, 163 Ohio St. 44, 48, 125 N.E.2d 338, 341 (1955) (lease expires after primary term unless production in paying quantities and there can be no production in paying quantities if there is no production at all). Where the condition in

the secondary term is production in paying quantities, the lease terminates by the express terms of the contract and by operation of law when the well stops producing in paying quantities. *Swallie v. Rousenberg*, 190 Ohio App.3d 473, 484, 2010-Ohio-4573, 942 N.E.2d 1109, ¶ 63 (7th Dist.), citing *American Energy Serv. v. Lekan*, 75 Ohio App.3d 205, 212, 598 N.E.2d 1315 (1992) (appellate court attaching and adopting trial court's opinion).

{¶22} The parties agree that the mere temporary cessation of production in paying quantities will not cause the lease to terminate under the habendum clause where the lessee uses *reasonable diligence* and good faith in attempting to resume production. *See Wagner v. Smith*, 8 Ohio App.3d 90, 92, 456 N.E.2d 523 (4th Dist.1982) ("Courts universally recognize" this principle). *See also Moore v. Adams,* 5th Dist. No. 2007AP090066, 2008-Ohio-5953, ¶ 39 (must use reasonable diligence in placing well back into production after interruption occurs), citing *5 Williams & Meyers, Oil and Gas Law (1991); American Energy*, 75 Ohio App.3d at 214 ("lessees can still have valid lease rights after a reasonable period of non-production for certain valid purposes. However, when interruptions occur, the lessee is obligated to exercise reasonable diligence to place the well back into production."). The parties focus on the Fourth District's *Wagner* case.

{¶23} In *Wagner*, a well began producing oil and gas in 1963. The continuation of the lease after the primary term was based upon production in paying quantities. In 1978, gas production stopped and the lessee became aware of a hole in the well casing, which caused the well to flood with water. Oil production dwindled and stopped by mid-1979, when the existence of the defect was confirmed. No royalties were paid that year. The well operator testified that he could not get his partners to agree on how to proceed. He noted the expense of the various repair options and his reluctance to file a partition action against the minority owner. In the summer of 1980, a clay injection was aborted due to water pressure in the well. The complaint by the landowner was filed in January 1981. In March 1981, the operator brought pipe to the well site and began negotiations with contractors. By the time of trial in July 1981, the pipe had not been installed (and thus production had not resumed).

**{¶24}** The Fourth District recognized that it is in the very nature of an oil and gas well for production interruptions to occur ranging from temporary to permanent. *Id.* at 92. The court noted that in its research of cases from other states, cessation in production for two years or more rarely coincides with a finding of diligence. *Id.* at 94. The court concluded that in light of the totality of the circumstances of the case before it, the lessee did not proceed with the diligence required and thus the cessation in production was more than temporary. *Id.* at 95. The trial court's decision finding a temporary cessation was reversed as being contrary to the manifest weight of the evidence. *Id.*

**{¶25}** Appellant notes that the Fourth District in *Wagner* did not find the partners' inability to agree to be a compelling reason for the delay. Appellant compares that scenario to the situation here involving Chevron buying the parent of Resource and stopping repair jobs due to its decision to renegotiate agreements with subcontractors. Appellant urges that the *Wagner* court's reversal of the trial court's factual decision on reasonableness after a bench trial supports its position that the trial court's summary judgment decision here was improper.

**{¶26}** The parties agree the well was out of production for 18 months.[3] Appellant does not take issue with the reasonableness of the actions from the February 2010 mechanical breakdown through the April 7, 2010 water injection test and solvent injection procedure. Appellant states that the "heart" of the case is the sixteen months from the solvent injection until the pump replacement work started on August 19, 2011. Still, Appellant concedes that Resource was justified in waiting until the summer of 2010 to ascertain whether the solvent worked. In addition, there does not appear to be a dispute over the reasonable diligence during the time period from preparation of the AFE on July 22, 2011, to its approval on August 2, 2011, to the scheduling of the job for the middle of August, and to the one-week repair job finishing on August 25, 2011.

---

[3] Appellant makes a brief assertion that the well was out of production in paying quantities for several weeks after production resumed on August 25, 2011 because the oil was not sold until October 17, 2011. However, no evidence or support is provided for the position that the oil pumped and collected during that time would not fall within the rubric of production in paying quantities. That is, it is not the date of the sale of the oil but the date of production (in paying quantities in the judgment of the lessee).

**{¶27}** Appellant concludes that the well was out of production for a year longer than it would have been if Resource had acted diligently. Consequently, the disputed period of diligence or claim of unreasonableness essentially lies between the summer of 2010 and the summer of 2011. Reasons for the delay include: failure to schedule the repair job before winter in 2010 (due to a belief that the subcontractor's rig would be unavailable as scheduling occurs at the beginning of the year); failure to perform repairs during the winter (due to safety and legal issues); and failure to schedule the repair job for spring 2011 (due to Chevron purchasing Resource's parent and requiring all service agreements with subcontractors to be renegotiated).

**{¶28}** Appellant initially sets forth an argument that reasonableness is a question of fact for trial. Appellant cites cases stating, for instance, "Reasonableness is a question of fact inappropriate for consideration on summary judgment." *See, e.g., Tincher v. Interstate Precision Tool Corp.*, 2d Dist. No. 19093 (June 28, 2002) (holding that there was genuine issue as whether the landlord used reasonable efforts to re-rent the property). However, holdings such as this should be limited to the case before the court. In fact, later in the *Tincher* holding, the Second District qualified its holding with the phrase, "[o]n this record." *Id.* Additionally, the Sixth District case cited by Appellant stated: "what constitutes 'reasonableness' is *ordinarily* a question of fact." *Wood v. Dorcas*, 142 Ohio App.3d 783, 791, 757 N.E.2d 17 (6th Dist.2001) (emphasis added). *See also Coleman v. Kindercare Learning Ctr., Inc.*, 10th Dist. No. 99AP-259 (Dec. 30, 1999) ("Reasonableness is *generally* a question of fact to be resolved by the trier of fact") (emphasis added).

**{¶29}** The summary judgment test entails a decision on whether some reasonable mind could rule in favor of the non-movant. Civ.R. 56(C). Thus, if no reasonable mind could find that the lessee's conduct during the cessation of production was unreasonable under the facts of this case, then summary judgment could be granted in favor of the lessee. On the other hand, if reasonable minds could differ as to whether the lessee acted with reasonable diligence, then summary judgment would be inappropriate. Merely because the applicable legal test involves an evaluation of reasonableness does not per se make the case unavailable for

summary judgment. In accordance, the question of reasonableness can be resolved through summary judgment *in the proper case.* The question is whether this is the proper case. This brings us back to Appellant's main argument that the question of Resource's reasonable diligence in placing the well back into production is a genuine issue of material fact under the totality of the circumstances that exist in this case.

**{¶30}** In evaluating this issue, we must address Appellees' suggestion that Appellant did not meet its reciprocal summary judgment burden due to the failure to present independent evidence. Appellees emphasize that their witness provided the reasons for the delay in resuming production but Appellant offered no evidence that these reasons did not constitute reasonable diligence or rebut the opinion of their witness that the delay was reasonable. Appellees believe Appellant relies on a bare argument, as opposed to evidence, in positing there is a genuine issue of material fact as to reasonable diligence.

**{¶31}** As aforementioned, the non-movant's response must set forth specific facts showing that there is a genuine issue for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E). Still, the non-movant can rely on the evidentiary material submitted by the movant rather than submitting independent evidentiary material. *AAAA Ents.*, 50 Ohio St.3d 157 at 161. For instance, the Supreme Court held that the non-movant could avoid summary judgment by merely relying on the city's physical condition survey, which city council expressly relied upon, in making a decision and in seeking summary judgment. *Id.* (viewing the survey in the light most favorable to the non-movant, a reasonable mind could find the area was not blighted due to the condition of the majority of structures).

**{¶32}** Appellant may rely on Cayton's deposition testimony and the statements within his affidavit, including the exhibits attached thereto. Cayton provided his opinion that the delay in resuming production was reasonable in his experience. However, that opinion did not make it an established premise or require an opposing witness to specifically offer a counter-opinion that the delay was unreasonable. We also note that Cayton believed the delay would not be unreasonable unless the well was never fixed or the well was "let go for a period of years." (Tr. 86).

**{¶33}** As the parties agree, whether the cessation was temporary and the delay in repair was reasonable is the applicable *legal test.* An opinion on whether a certain amount of delay (based upon the various circumstances of the case) meets the legal test of reasonable diligence does not bind the court to find that the legal test was met merely because the non-movant did not provide a factual opinion from a witness that the legal test was not met.

**{¶34}** The question is whether any reasonable mind could find that Resource did not use reasonable diligence in its efforts to repair the well. Stated another way: could any reasonable person hear the evidence and conclude that the delay in repairing the well was unreasonable? In determining whether there exists a genuine issue for trial on the reasonableness of the delay in repairing the well, the evidence and all reasonable inferences to be drawn from that evidence must be construed in the light most favorable to Appellant. *See Jackson*, 117 Ohio St.3d 328 at ¶ 11. The court "may not weigh the proof or choose among reasonable inferences." *Dupler*, 64 Ohio St.2d at 121.

**{¶35}** In considering whether there existed reasonable diligence in repairing the well, the totality of the circumstances must be considered. *Wagner*, 8 Ohio App.3d at 93 ("all attendant circumstances must be taken into account" in determining the reasonableness of the lessee's conduct in resuming production), citing *Jath Oil Co. v. Durbin Branch*, 490 P.2d 1086 (Okla.1971). The length of the delay is one critical factor. *Id.* at 93. The reason for the cessation and the various reasons for the delay in resumption are also important considerations. *See id.*

**{¶36}** Contrary to the suggestion in Resource's brief, the courts have not established a two-year time threshold. Rather, the *Wagner* court merely noted that in its research, a delay of more than two years will rarely be considered temporary. *Id.* at 94. The court did not say that delay of less than two years will always or usually be considered temporary. In fact, the court quoted a case stating that the longest period permitted in Oklahoma judicial history for temporary cessation was twelve months (and finding that delay could have been construed as only six months). *Id.* at 94, citing *Jath Oil*, 490 P.2d 1086 (Okla.1971), citing *Kerr v. Hillenberg*, 373 P.2d 66 (Okla.1962).

**{¶37}** The *Jath* Court upheld a trial court's decision finding a period of cessation of more than two years unreasonable where the cause was a power breakdown but no effort to fix it was made due to a foreclosure action against one of the fractional interests. *Jath Oil*, 490 P.2d 1086. The Oklahoma Supreme Court later reiterated that the appropriate period is not measured in days, weeks, or months but by the time appropriate under all of the circumstances. *Barby v. Singer*, 648 P.2d 14, 16-17 (Okla.1982) (trier of fact could find reasonable a fourteen-month period of cessation or reduction in production so that well operated at a loss while operator awaited a decision on a new federal law regarding a pipeline). Notably, none of these decisions was rendered by way of summary judgment.

**{¶38}** A case that did deal with summary judgment was the Fifth District's *Lock* case which involved a twenty-year lease with a secondary term as long as oil or gas is found on the premises in paying quantities in the judgment of the lessee. Production in paying quantities occurred until January 1982. It was said to be undisputed that the operator "worked from January 1982 to April 18, 1985 to get the well back into production and expended substantial money [said to be several thousands of dollars], all of the foregoing with the knowledge of [the landowner]." In response to an inquiry from the landowner, the operator had informed the landowner, who did not protest, that he was moving onto the land to work on the well. Due to the lengthy cessation in production, the trial court granted summary judgment against the operator and terminated the lease. The appellate court reversed, finding that summary judgment was inappropriate, and remanded with instructions for the trial court to enter judgment in favor of the appellant. *Lock v. Ridgeway*, 5th Dist. No. 86-CA-15 (Mar. 6, 1987). The *Lock* case may be distinguishable as it appeared to be undisputed that the operator's efforts were continuous and there was emphasis on the lack of protest to the operator moving onto the property after a direct inquiry from the landowner.

**{¶39}** Besides urging that the testimony presented by Cayton could be weighed by a reasonable person as showing a lack of reasonable diligence on the part of Resource, Appellant also contends that Cayton's deposition was inconsistent with his earlier affidavit in various ways. Appellant asks for the application of law

holding that a movant is not entitled to summary judgment if his deposition testimony is contradicted by his later affidavit. *See Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 26, citing *Turner v. Turner*, 67 Ohio St.3d 337, 617 N.E.2d 1123 (1993) (movant cannot benefit by changing statements) and *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St.3d 571, 575-576, 653 N.E.2d 381 (1995) (when a movant makes substantive changes to his prior assertions, a matter of credibility arises).

**{¶40}** Appellant states that Cayton admitted repairs can be undertaken in winter for high priority jobs. However, this testimony related to environmental threats and safety hazards. Appellant also emphasizes how Cayton's affidavit stated by the time it was determined the solvent did not work, it was too late to schedule a rig as they are scheduled in the beginning of the year. Cayton's deposition disclosed that expenditures are prioritized not only by the order the well stops working but also by the profitability of the well. (Depo. at 49). Furthermore, Cayton's deposition testimony mentioned it was not unusual for a subcontractor to inform them it would take three to four months to obtain a rig that was not prescheduled. (Depo. at 85).

**{¶41}** Appellant is not contesting Resource's choice of procedures used to repair the well. *Compare Smith v. Wayne Cty.*, 9th Dist. No. 02CA13, 2013-Ohio-364 (ruling based upon the lack of evidence rebutting defendant's testimony that proper procedure was used to address plaintiff's civil rights grievance); *Sandy v. Rataicziak*, 7th Dist. No. 08NO347, 2008-Ohio-6212 (defendant presented Civ.R. 56 evidence that they had authority to be on property, but plaintiff in trespass action did not present evidence to the contrary). Nor is Appellant contesting that "a few weeks to a few months" is an acceptable period to wait to ascertain whether the solvent worked.

**{¶42}** Rather, Appellant argues that Resource let the project languish between the summer of 2010 and the summer of 2011 before taking action in July and August 2011. Appellant notes that after the solvent failed to work, the remedy was a one-week repair job anticipated to cost merely $7,000, a cost which would be recouped in five months. As for the delay awaiting new agreements with subcontractors, the merger occurred a year after the well failed. It is urged that a company cannot hide behind the corporate bureaucracy of its new parent company in

order to obtain a finding as a matter of law that its actions were reasonable in delaying a well's repair, especially where timing and weather have already delayed the repair. New corporate policies regarding subcontractors after a merger do not per se allow tolling of the time relevant to whether a delay in repair was reasonable.

**{¶43}** Furthermore, according to Cayton's testimony about the range of time it could take to determine whether a solvent injection worked, Resource could have known whether the injection failed sometime before or during the summer of 2010. Importantly, Cayton testified at deposition that he had no information on when or how often the solvent injection was checked after April 7, 2010 or when a determination was made that the solvent did not work. Their subcontractor has previously been able to provide a rig within three to four months in cases where it was not prescheduled. Three to four months from the (unknown time in) summer of 2010 could have fallen before winter.

**{¶44}** Furthermore, Cayton testified that a rig could not be scheduled without an approved AFE. Resource did not prepare an AFE until July 2011. It is questioned how Cayton could opine it was too late to schedule a rig in 2010 when he did not know when it was determined the solvent did not work and where no AFE was submitted for approval in 2010. As Appellant observes, if a rig could not be scheduled in 2010 because the schedule is made at the beginning of the year, then how was a rig scheduled for August 19, 2011 when the AFE was not approved until August 2, 2011? The unavailability of a rig in 2010 was not an established or undisputed fact.

**{¶45}** Appellees are asking us to conclude that the eighteen-month cessation in production must, as a matter of law, be labeled reasonable repair delay based upon the facts presented at the summary judgment stage in this case. We must construe the evidence and all reasonable inferences in the light most favorable to Appellant in ascertaining whether reasonable minds could only rule in favor of Appellees. We conclude there are genuine issues of material fact remaining for trial as to whether Resource used reasonable diligence in repairing the well. In accordance, Appellant's first argument has merit, and the entry of summary judgment is reversed.

PERPETUAL LEASE

**{¶46}** Appellant's second issue presented queries:

"Whether the lease in question is a perpetual 'no term' lease which violates public policy and was void ab initio."

**{¶47}** As aforementioned, the habendum clause provides that after the primary term, the lease shall continue for "so much longer thereafter * * * as oil and gas or their constituents shall be found on the premises in paying quantities in the judgment of the Lessee * * *." Appellant believes this clause provides the lessee with "unfettered discretion to extend the lease indefinitely." It is urged that this renders the lease a "no term" perpetual lease. Appellant concludes that the lease is void ab initio because a perpetual lease is contrary to public policy.

**{¶48}** Appellant acknowledges that this argument was overruled by this court in *Hupp v. Beck Energy Corp.*, 7th Dist. Nos. 12MO6, 13MO2, 13MO3, 13MO11, 2014-Ohio-4255, 20 N.E.3d 732, 748. In *Hupp*, we began by stating: "although perpetual leases are disfavored by the law, courts have not found them to be per se illegal or void from their inception. *Id.* at ¶ 82, citing *Myers v. East Ohio Gas*, 51 Ohio St.2d 121, 364 N.E.2d 1369 (1977), *Hallock v. Kintzler*, 142 Ohio St. 287, 51 N.E.2d 905 (1943), and *Central Ohio Natural Gas & Fuel Co. v. Eckert*, 70 Ohio St. 127, 71 N.E. 281 (1904).

**{¶49}** Regardless, this court determined the language in the habendum clause did not create a "no term" perpetual lease because it provided a secondary term that depended on production (or whatever additional conditions were contained in the clause). *See id.* at ¶ 86-87, 90 (the conditions were: "are produced or are capable of being produced on the premises in paying quantities"). We concluded that the phrase "in the judgment of the Lessee" did not permit the lease to continue in perpetuity at the lessee's sole and arbitrary discretion because courts have imposed a good faith standard on the lessee's judgment when determining "paying quantities." *Id.* at ¶ 102-103.

**{¶50}** Appellant acknowledges that application of our *Hupp* decision here defeats its argument on the topic of perpetual leases. Appellant notes that the issue

is raised in order to preserve it[4] or in case we decide to revisit our *Hupp* decision. No new or additional arguments have been presented on the topic.

**{¶51}** We have applied the pertinent holding in *Hupp* more recently in two other cases. In those cases, we reiterated the holding that a lease that places the satisfaction of "paying quantities" test "in the judgment of the Lessee" does not render the lease perpetual or subject to the sole discretion of the lessee. *See Belmont Hills Country Club v. Beck Energy Corp.*, 7th Dist. No. 13BE18, 2015-Ohio-1322, ¶ 29-30; *Bentley v. Beck Energy Corp.*, 7th Dist. Nos. 13BE33, 13BE34, 2015-Ohio-1375, ¶ 32. We maintain our decisions in *Hupp*, *Belmont Hills Country Club*, and *Bentley*. On that basis, Appellant's second argument is overruled.

**{¶52}** For the following reasons, the entry of summary judgment is reversed, and the case is remanded for further proceedings.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.

---

[4] Appellant hopes the Ohio Supreme Court will reverse the pending *Hupp* case. *See Hupp*, 141 Ohio St.3d 1454, 2015-Ohio-239, 23 N.E.3d 1196 (accepting propositions of law I and II). CNX points out that the proposition submitted to the Supreme Court on the perpetual lease issue focuses on the lessee's ability to maintain the lease *without developing the land* due to the "capable of production" portion of the clause (and an argument on delay rentals). *See* Memo. in Support of Jur., Prop. of Law I. Here, development has occurred, and the pertinent lease language is "shall be found on the premises in paying quantities in the judgment of the Lessee." In any event, all parties agree that Appellant's argument must be overruled if we maintain our decision in *Hupp*.